IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY MIKULA,<br><br>    Plaintiff,<br><br> v.<br><br>WEST SHORE WINDOW & DOOR, INC.<br>d/b/a WEST SHORE HOME,<br><br>    Defendant. | 2:18-cv-1341-NR |

## MEMORANDUM OPINION

**J. Nicholas Ranjan, United States District Judge**

Plaintiff Jeffrey Mikula brings claims for retaliation and sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act (the "PHRA") and negligent/intentional infliction of emotional distress as the result of Defendant West Shore Window & Door, Inc.'s decision to terminate his employment. West Shore contends that it terminated Mr. Mikula for "insubordination." Mr. Mikula claims that this proffered reason is pretextual, and that he was really terminated as retaliation for reporting an inappropriate and harassing comment made by one of his supervisors and for not conforming to the "sexist and male chauvinistic gender stereotype" that prevailed at West Shore.

West Shore has moved for summary judgment on all of Mr. Mikula's claims. [ECF 36]. The Motion is fully briefed and ripe for disposition. For the reasons below, the Motion will be **DENIED** with respect to the retaliation claims and **GRANTED** with respect to the sex discrimination and emotional distress claims.

### I.   FACTUAL BACKGROUND

**A.  Mr. Mikula's Begins His Employment at West Shore.**

West Shore is a home improvement business focusing on window and door replacements and bathroom remodeling. [ECF 37, at 1].

In May 2017, Mr. Mikula began working for West Shore as a Field Sales Manager in West Shore's Oakmont office. [ECF 38, at ¶ 1]. As a Field Sales Manager, Mr. Mikula supervised approximately six Field Service Representatives and managed the Field Sales Department. [*Id.* at ¶¶ 4-5]. Initially, Mr. Mikula reported directly to West Shore's President and CEO, William Werzyn. [*Id.* at ¶ 2].

West Shore contends that Mr. Mikula failed to meet expectations in this role. [ECF 38, at ¶ 11]. Mr. Mikula does not dispute that he failed to meet certain performance benchmarks, but

- 1 -

argues that he was not "expected" to meet those benchmarks due to the "disarray" of his department when he assumed the role. [ECF 44, at ¶ 6].

**B.  Mr. Mikula Is Transferred to Another Job.**

In October 2017, West Shore transitioned Mr. Mikula to the position of In-Home Sales Representative, under Neil Parker. [ECF 38, at ¶ 13]. According to West Shore, it made this move because of Mr. Mikula's "unsatisfactory performance" [*id.* at ¶ 13] and the transition was "not a promotion within [its] system" [*id.* at ¶ 15]. Mr. Mikula, on the other hand, argues it was a promotion because he would have received a significant salary increase as a result of the change. [ECF 44, at ¶ 13].

Unlike his role as the Field Sales Manager, as an In-Home Sales Representative, Mr. Mikula would have been solely responsible for selling West Shore's products to potential customers with no direct reports and no management responsibilities. [ECF 38, at ¶¶ 14-15]. Mr. Mikula would also no longer have a guaranteed salary; instead, his compensation would be based purely on commissions. [ECF 39-1, at 126:25-127:4].

As a condition of his transition, West Shore required Mr. Mikula to undergo three weeks of training. [ECF 38, at ¶¶ 20-21]. West Shore also claims that Mr. Mikula agreed to accept West Shore's proven sales techniques and processes in "blind faith" and fully support its products for a period of 90 days. [*Id.* at ¶ 16]. West Shore imposed this added condition "due to [Mr. Mikula's] prior history of confrontational conduct and questioning West Shore's processes." [*Id.* at ¶ 17]. Mr. Mikula denies that he ever agreed to a period of "blind faith" acceptance of West Shore's sales processes and policies. [ECF 44, at ¶ 16].

**C.  West Shore Terminates Mr. Mikula.**

West Shore contends that during his training period, Mr. Mikula repeatedly violated the "blind faith agreement," despite numerous warnings. [ECF 38, at ¶¶ 22-33]. As a result, on the recommendation of Mr. Parker, West Shore terminated Mr. Mikula on October 24, 2017 for "insubordination." [*Id.* at ¶¶ 38-39]. Mr. Parker's recommendation was "reviewed and approved" by the Director of Human Resources, Josh Wood. [ECF 39-4, at ¶ 14]. Mr. Mikula also offers affidavit testimony that Mr. Werzyn and Mr. Leary were involved in the termination decision. [ECF 43, at 14-15].

Mr. Mikula argues that this reason was pretextual and that West Shore actually fired him in retaliation for reporting "harassing sexual comments by his training supervisor" [ECF 43, at 4] and for failing to conform to "the sexist and male chauvinistic gender stereotype to which [West Shore's] management team adhered, fostered, and preferred" [ECF 13, at ¶ 44].

**D.  Mr. Mikula Reports Alleged Harassing Comment.**

The alleged harassing comment was an attempted joke made by Mr. Parker at a staff meeting on October 11, 2017. Approximately 12 people attended this meeting, including at least two women. [ECF 39-1, at 97:22-98:7]. Mr. Mikula described the joke as follows:

> A. So the meeting was supposed to start at 8:30 or whatever time it was and Neil asked Mike Plumbee and myself to remain outside the meeting for the first part. And we were out there for maybe an hour, and they asked us to rejoin the meeting. And whenever we first came in, he was introducing us and he said this is Jeff Mikula and this is Mike what's your last name? What is it? It's—Mike Hunt—no, no. That's right, Plumbee.

[*Id.* at 99:24-100:7]. Mr. Mikula reported the comment to Mr. Wood later that same day. [*Id.* at 101:14-19].

Mr. Wood stated that he found this "joke" to have violated West Shore's policies and immediately addressed the incident with Mr. Parker. [ECF 39-4, at ¶ 19]. Mr. Wood further stated that he "did not disclose the identity of the person who made the report to Mr. Parker." [*Id.*]. Mr. Parker, for his part, also stated that he "did not know which employee had reported [his] comment to the Human Resources Department and had no reason to suspect that it was [Mr. Mikula]." [ECF 39-2, at ¶ 18]. Mr. Parker stated that Mr. Mikula's "report played no role whatsoever in my decision to terminate his employment." [*Id.* at ¶ 19]. Mr. Wood also claims that Mr. Mikula's "report of Mr. Parker's comment was not a factor in the decision to terminate his employment." [ECF 39-4, at ¶ 24].

Mr. Mikula disputes this version of events and claims that his supervisors disapproved a "prior complaint about sexually harassing/offensive statements to his female staff." [ECF 44, at ¶ 62].

### E. Alleged Gender Stereotype.

Mr. Mikula does not provide the precise contours of the alleged gender stereotype to which he claims he did not belong. To support his claim regarding the existence of the stereotype, Mr. Mikula simply cites a general "corporate culture of disapproval of complaints about inappropriate sexist comments towards West Shore's female employees." [ECF 43, at 12]. As evidence of this "corporate culture," Mr. Mikula offers the comment made by Mr. Parker, management's response to an incident that occurred at the Hookstown Fair in August 2017, and allegedly fewer opportunities available to the women at West Shore. [*Id.* at 11-12].

At the Hookstown Fair, some of Mr. Mikula's female team members reported that a third-party vendor made sexist comments towards them. [ECF 39-1, at 112:15-113:14]. Mr. Mikula reported it to the event's organizers and when that failed to remedy the situation, he pulled West Shore's employees from the event. [*Id.*]. Mr. Mikula admits, however, that he was not disciplined for this decision and that his supervisor at the time, Mr. Leary, never told him he made the wrong decision. [*Id.* at 115:2-9]. Mr. Mikula asserts that Mr. Leary later expressed disapproval to one of his colleagues, Jaime Bader. [*Id.* at 115:12-17; ECF 45-3, at ¶ 4].

Mr. Mikula also claims that West Shore gave female employees fewer opportunities, especially as design consultants. [ECF 39-1, at 107:23-108:7]. But his own testimony directly contradicts this claim, as he acknowledged that, while he worked at West Shore, there were three

female design consultants. [*Id.* at 108:25-109:9]. He further acknowledged that there were women in management positions, women who reported directly to Mr. Weczyn, and that a woman replaced him in his old job. [*Id.* at 109:15-110:1, 115:15-22, 116:9-11, 116:15-24].

As additional proof, Mr. Mikula alleges that he had to request a "more diverse candidate pool" for hiring new employees to his team when he was the Field Sales Manager. [ECF 39-1, at 112:17-124:11]. He admits, however, that when he did, Mr. Wood promptly complied and provided the requested diverse candidates. [*Id.* at 124:1-6].

Finally, relevant to this Motion, Mr. Mikula conceded that he never heard Mr. Weczyn, Mr. Wood, or Mr. Leary make discriminatory or harassing remarks about women. [*Id.* at 104:7-105:6]. Mr. Mikula further acknowledged:

- West Shore had an anti-harassment policy in place [*id.* at 46:24-27:2];

- West Shore promoted an "open door" complaint procedure [*id.* at 48:13-19];

- He felt comfortable bringing complaints during his brief employment at West Shore [*id.* at 48:20-22]; and

- He had a "good" relationship with his supervisor, Mr. Leary [*id.* at 53:23-25].

## II. PROCEDURAL BACKGROUND

Mr. Mikula filed his original Complaint [ECF 1] on October 9, 2018, alleging gender discrimination and retaliation in violation of Title VII and negligent and/or intentional infliction of emotional distress. Later, on January 18, 2019, Mr. Mikula filed an Amended Complaint, adding claims under the PHRA. [ECF 13].

On July 30, 2019, West Shore filed its Motion for Summary Judgment. [ECF 35]. The motion has been fully briefed as of September 12, 2019. The Court held oral argument on October 22, 2019.

## III. LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the inquiry is whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

"[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party" and the non-moving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp.*

*Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  *Celotext Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

As for the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  *Anderson*, 477 U.S. at 249-50.  There must be more than "a scintilla of evidence" supporting the non-moving party and "more than some metaphysical doubt as to the material facts."  *Id.* at 252, 261 (internal marks omitted).

## IV. DISCUSSION AND ANALYSIS[1]

### A. Mr. Mikula Has Offered Sufficient Evidence to Survive Summary Judgment on His Retaliation Claim.

Mr. Mikula claims that West Shore terminated him because he reported an allegedly inappropriate and sexist comment made by his then-supervisor, Mr. Parker.  [ECF 43, at 15-16].  Section 704(a) of Title VII states, in relevant part, that "[i]t shall be an unlawful employment practice for an employer to discriminate against [an employee]…because he has made a charge" of discrimination against the employer.  42 U.S.C. § 2000e-3(a).

"To establish a *prima facie* case of retaliation under Title VII and the PHRA, a plaintiff must produce evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."  *Tourtellotte v. Eli Lily & Co.*, 636 F. App'x 831, 852 (3d Cir. 2016) (internal marks and citation omitted).

If the plaintiff establishes a *prima facie* case, the analysis proceeds within the *McDonnell Douglas* burden-shifting framework.  *Id.*  The employer must first establish a legitimate, non-retaliatory reason for its action.  *Id.*  If the employer makes such a showing, "the burden shifts back to the employee, who must demonstrate, by the preponderance of the evidence, that the employer's proffered reasons were merely pretextual."  *Id.* (citation omitted).

#### 1. Mr. Mikula Has Established His *Prima Facie* Case.

The first two elements of Mr. Mikula's *prima facie* case are not in dispute.  [ECF 37, at 13-18].  West Shore's argument is simply that Mr. Mikula's "claim for retaliation fails on the third prong" because he "failed to identify any facts which demonstrate a causal connection between his discharge and his alleged engagement in a protected activity."  [*Id.* at 13-14].  The Court disagrees; Mr. Mikula has offered enough evidence for a reasonable jury to draw a causal connection between his report of Mr. Parker's inappropriate comment and his termination.

---

[1] The Third Circuit has stated that "[c]laims under the PHRA are interpreted coextensively with Title VII claims."  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013) (quoting *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (2d Cir. 2006))  As a result, the Court will address them simultaneously throughout this Opinion.

Courts are instructed to "consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (internal citation omitted). "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *Id.*

A gap of, at most, 10 business days between the protected activity (*i.e.*, reporting Mr. Parker's inappropriate comment) and Mr. Mikula's termination is close enough to be considered "unusually suggestive" of a causal connection in this case. *See, e.g.*, *Palish v. K & K RX Servs., L.P.*, No. 13-4092, 2014 WL 2692489, at *10 (E.D. Pa. June 13, 2014) ("Plaintiff suffered an adverse action when he was terminated, and the temporal proximity (two weeks) between his protected activity and his termination is sufficient to establish the requisite causal link for purposes of the prima facie case."); *Rymas v. Princeton Healthcare Sys. Holding, Inc.*, No. 15-8188, 2017 WL 4858123, at *11 (D.N.J. Oct. 27, 2017) ("The Court agrees two weeks is sufficient temporal proximity to permit a reasonable jury to find Plaintiff has raised an inference of retaliation."); *Vira v. Crowley Liner Servs., Inc.*, 723 F. App'x 888, 893 (11th Cir. 2018) ("Whether 8 or 13 days, the timing between the two events suggests a causal relationship sufficient to establish a *prima facie* case of FMLA retaliation."). Given the size of West Shore and the fact that there were at least two layers of review for the termination decision, 10 business days, in the context of this case, is a relatively short period of time.[2]

West Shore makes two arguments to overcome this temporal proximity, both of which are unavailing.

*First*, West Shore argues that the sole decision-maker for the termination, Mr. Parker, "was unaware that [Mr. Mikula] had been involved in the report to the Human Resources Department about the comment" and, therefore, Mr. Mikula's "claim for retaliation fails without need for further assessment." [ECF 37, at 14]. While it is true that Mr. Parker claims he was unaware of Mr. Mikula's complaint, West Shore's own submissions create a dispute of material fact about whether he was the sole decision-maker. The affidavit submitted by Mr. Wood states that he "reviewed and approved" the termination recommendation made by Mr. Parker and it is undisputed that Mr. Wood knew about Mr. Mikula's complaint. [ECF 39-4, at ¶¶ 14, 17]. Mr. Mikula has also offered evidence that suggests Mr. Werzyn and Mr. Leary may have been involved in the termination. [ECF 43, at 14-15]. Specifically, Kevin Earnest stated in his affidavit that Mr. Werzyn told him that he and Mr. Leary "made a decision to fire [Mr.

---

[2] Specifically, West Shore is a company with multiple locations and multiple layers of supervision, which includes, at a minimum, a CEO, sales team leads, and a director of human resources. [ECF 38, at ¶¶ 22, 37; ECF 39-2, at ¶ 1; ECF 39-4, at ¶ 2]. There were at least two layers of approval in the decision to terminate Mr. Mikula: Mr. Parker and Mr. Wood. [ECF 39-4, at ¶ 14]. Under these specific circumstances, 10 business days between the protected activity and Mr. Mikula's termination is unduly suggestive. What's more, the record does not reflect the precise day that West Shore internally made the decision to terminate Mr. Mikula, which very well could have been less than 10 business days before Mr. Mikula's report. *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 305 (3d Cir. 2007) (explaining that date termination decision was made is the relevant date for unduly suggestive analysis).

Mikula]."³  [ECF 45-2, at ¶ 7].  West Shore has not offered evidence regarding their lack of knowledge regarding the complaint.  Thus, contrary to West Shore's argument, at least one of the potential decisionmakers involved in the termination decision knew about Mr. Mikula's protected activity, and possibly more.

*Second*, West Shore argues for the first time in its Reply that any causal link was "broken by an intervening event."  [ECF 46, at 3].  According to West Shore, that intervening event was Mr. Mikula's refusal to comply with the so-called "blind faith agreement."  [*Id.* at 3-4].  Again, West Shore is half right.  It is true that an intervening event can break the causal chain (*see Outten v. Genesis Health Care, LLC*, No. 13-4708, 2014 WL 3964918, at *12 (E.D. Pa. Aug. 12, 2014)), but this case does not present such an event, at least at this stage of the case.  The insubordination West Shore cites as the intervening event is actually a series of events that allegedly occurred over the course of several weeks and, as a result, does not offer a clear, definitive break in the causal chain.  [ECF 38, at ¶¶ 22-34].  More importantly, as will be analyzed below, nearly every facet of this alleged insubordination is challenged by Mr. Mikula, including whether he was told not to ask questions, the nature of the questions he asked, and the responses he received to those questions.  [ECF 44, at ¶¶ 22-34].  These factual disputes preclude a finding of a superseding cause at the summary judgment stage.

Mr. Mikula has done enough to establish his *prima facie* case.  The time period between Mr. Mikula engaging in protected activity and his termination is unduly suggestive of retaliation and is, by itself, enough to shift the burden back to West Shore.  Additionally, the "broad array" of evidence offered by Mr. Mikula creates a genuine issue of material fact regarding who was involved in the termination decision and their knowledge about Mr. Mikula's report of the inappropriate comment.

### 2. There Is a Dispute of Material Fact Regarding the Legitimacy of West Shore's Reason for Termination.

Mr. Mikula does not dispute that West Shore has carried its burden to offer a legitimate, non-retaliatory reason for his termination—namely, that he failed to comply with the purported "blind faith agreement" and engaged in insubordination.  *See* [ECF 43].  Mr. Mikula asserts, however, that this reason is merely pretextual and that he was terminated for reporting Mr. Parker's inappropriate comment.  [ECF 13, at ¶ 38].

Mr. Mikula can "demonstrate pretext at summary judgment in two different ways." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  "First, the plaintiff may point to evidence in the record that would cause a reasonable juror to disbelieve the employers articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the

---

³       The statements made by Mr. Leary and Mr. Werzyn likely fall under the exclusions from hearsay set forth in Fed. R. Evid. 801(d)(2).  Even if they do not, "the court may consider evidence that is not admissible in the submitted form if the party offering the evidence could satisfy the applicable admissibility requirements at trial."  *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004); *see also Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000) ("[H]earsay statements can be considered on a motion for summary judgment if they are capable of admission at trial.").

credibility of that reason." *Id.* at 430 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Second, the plaintiff can point "to evidence that indicates that the employer acted with discriminatory animus." *Id.* at 430-31.

Mr. Mikula can satisfy the first method of demonstrating pretext by providing evidence that "demonstrates weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions from which a reasonable juror could conclude that the defendant's explanation is unworthy of credence, and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (internal marks and citation omitted). Significantly, if "a plaintiff comes forward with evidence that would cause a reasonable factfinder to find the defendant's proffered reason 'unworthy of credence,' she need not adduce any evidence of discrimination beyond her prima facie case to survive summary judgment." *Burton*, 707 F.3d at 430 (citations omitted). Because "the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." *Id.* (citing *Fuentes*, 32 F.3d at 764). "The plaintiff is therefore not required to produce direct evidence of discriminatory intent to demonstrate pretext and survive summary judgment."

Here, Mr. Mikula has cast enough doubt on the reason proffered by West Shore for his termination.

Mr. Mikula disputes that West Shore imposed a "blind faith agreement" to "sell according to West Shore's sales system without changing it" when he was set to transition into his new role as an In-Home Sales Representative. [ECF 43, at 8]. Mr. Mikula testified that no one told him that he had to accept West Shore's system without question. [ECF 39-1, at 76:25-78:2]. He further testified that although he did ask questions during his training, he was thanked for them, not reprimanded. [*Id.* at 93:5-11].

Moreover, West Shore's explanation for Mr. Mikula's termination has shifted somewhat during the Court's consideration of the present motion. At first, in its briefing, the "blind faith" agreement was a cornerstone of West Shore's narrative. Then, at argument, West Shore backed away from the importance of the agreement and took the position that it was irrelevant whether any such agreement even existed. *See Basile v. Westmoreland Cnty.*, No. 12-1847, 2013 WL 3147316, at *2 (W.D. Pa. June 19, 2013) ("Moreover, Plaintiff's allegations of his employer's shifting explanations of the reasons for his termination also support a 'non-speculative and non-conclusory' plausible inference that those proffered reasons were therefore pretextual….").

Viewing the evidence in the light most favorable to Mr. Mikula, as the Court is constrained to do at this stage, a reasonable factfinder could conclude that the alleged "blind faith agreement" never existed and that Mr. Mikula did not engage in any insubordination, which would eviscerate the foundation for West Shore's proffered reason for termination. *See Opper v. Fred Beans Motors of Doylestown, Inc.*, No. 18-4230, 2019 WL 4242627, at *10 (E.D. Pa. Sept. 6, 2019) ("In giving Plaintiff the benefit of all potential and reasonable inferences we agree that it is possible that a factfinder could interpret the foregoing facts in such a manner as to find that they cast doubt upon the veracity of Defendant's articulated reasons."). That is enough to allow Mr. Mikula's retaliation claim to move forward to trial. *See McSparren v. Pennsylvania*, 289 F.

Supp. 3d 616, 628 (M.D. Pa. 2018) (denying summary judgment where plaintiff offered evidence that "contradicted" defendant's justification for termination).

As a result, West Shore's motion for summary judgment as to Mr. Mikula's retaliation claims in Counts I and IV is **DENIED**.

**B.     Mr. Mikula's Sex Discrimination Based on Failure to Conform to Gender Stereotypes Fails.**

In Counts II and V, Mr. Mikula asserts that he was terminated because he "did not fit the sexist and male chauvinistic gender stereotype" to which West Shore's management team "adhered, fostered, and preferred." [ECF 13, at ¶¶ 44-45, 68-69]. As an initial matter, in both his Amended Complaint and his summary judgment briefing, Mr. Mikula fails to offer a clear description of the specific gender stereotype to which he supposedly did not conform. It appears to the Court that Mr. Mikula is arguing that he was terminated because he did not fit the stereotype that men do not "support and provide equal employment treatment for women" at West Shore. [ECF 43, at 10]. West Shore contends that "the record is devoid of any evidence that an anti-female stereotype existed or that [Mr. Mikula] was subjected to discrimination for failing to comply with any such stereotype." [ECF 37, at 13]. The Court agrees with West Shore.

"Title VII makes it unlawful for an employer 'to discriminate against any individual … because of such individual's race, color, religion, sex, or national origin,' and discrimination based on a failure to conform to gender stereotypes is cognizable[.]" *Pagan v. Gonzalez*, 430 F. App'x 170, 171-72 (3d Cir. 2011) (citing *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 290-91 (3d Cir. 2009)). Gender stereotyping claims stem from the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), when the Court held that a woman who was denied promotion because she failed to conform to feminine stereotypes had a cognizable claim that she was discriminated against "because of sex." *See Prowel*, 579 F.3d at 290.

"To prevail on a gender stereotyping claim, employees must demonstrate that their harasser was acting to punish their noncompliance with gender stereotypes." *Kiser v. Potter*, No. 10-22, 2012 WL 1134810, at *4 (W.D. Pa. Apr. 4, 2012) (citing *Prowel*, 579 F.3d at 290) (internal marks omitted). "Such a claim, however, must be dismissed at the summary judgment stage if the plaintiff fails to marshal sufficient evidence such that a reasonable jury could conclude that this form of discrimination/harassment has occurred." *Id.*

Here, Mr. Mikula argues that the Court should infer the existence of the "male chauvinistic" stereotype at West Shore because of: (1) the response he received when he complained about "an inappropriate attempted joke using vulgar language about female genitalia" made by his training supervisor [ECF 43, at 4]; (2) the response he received when he complained about "sexist comments towards West Shore's female employees" at the Hookstown Fair [*id.* at 11]; and (3) allegedly fewer opportunities available for women at West Shore [*id.* at 11-12]. Contrary to Mr. Mikula's suggestion, however, West Shore's undisputed responses to his actions do not support a finding that there was a general perception at West Shore that women, but not men, report inappropriate behavior or advocate for women in the workplace. Nor could a reasonable jury infer that Mr. Mikula's "co-workers thought that he did not

subscribe to a particular male stereotype" by engaging in these activities. *Allen v. Mineral Fiber Specialists, Inc.*, No. 02-7213, 2004 WL 231293, at *6 (E.D. Pa. Jan. 30, 2004) (granting summary judgment on Title VII gender stereotype claim). The record also does not establish that there were fewer opportunities available to women. In fact, the opposite is true on all counts.

Mr. Mikula's report about Mr. Parker's inappropriate comment aligned with West Shore's policies and practices in the Employee Handbook. For example, West Shore's Open Door Policy states "[e]mployees who have work-related concerns or feel they have been treated unfairly are encouraged to speak with their immediate supervisor" and if that supervisor cannot resolve the issue, to speak to "the next higher level of management or Human Resources." [ECF 39-5]. Similarly, West Shore's Anti-harassment and Complaint Procedure policy unambiguously states that West Shore "encourages the prompt good faith reporting of complaints or concerns so that rapid and constructive action can be taken before relationships become irreparably strained." [ECF 39-6]. These policies generally apply to all West Shore employees, not just the female employees.

The record further reflects that management took Mr. Mikula's report seriously. It is undisputed that Mr. Wood agreed that Mr. Parker's joke was inappropriate and contrary to West Shore's policies. [ECF 39-7]. Mr. Wood then promptly addressed the issue with Mr. Parker. [ECF 39-4, at ¶ 19; ECF 44, at ¶¶ 47-48]. That Mr. Wood, a man, agreed that Mr. Parker's joke violated West Shore's policies and took prompt action against him, significantly undermines Mr. Mikula's claim that a male stereotype of being "anti-woman" existed at West Shore. If such a stereotype did exist, Mr. Wood also did not conform to it, yet it does not appear that he suffered any adverse employment action as a result.

As for the Hookstown Fair incident, the record lacks evidence that Mr. Mikula suffered any reprisal for his decision to pull his team from the event and report the matter to the event's organizers. Indeed, Mr. Mikula testified during his deposition that he received no discipline for his decision [ECF 39-1, at 115:2-3] and that no one told him he should not have pulled his team from the fair [*id.* at 115:6-9]. Mr. Mikula claims that he "later learned" that his supervisor, Mr. Leary, expressed disapproval about his actions to a former colleague named Jaime Bader. [ECF 39-1, at 115:12-17]. This alleged comment does not create a dispute of material fact regarding the existence of an "anti-female" male stereotype at West Shore, however. According to Ms. Bader's affidavit, Mr. Leary told her that Mr. Mikula "shouldn't have brought up to the fair or the vendor the comments made by the vendor's representative to the West Shore Home female employees" because "he might get the guy in trouble." [ECF 45-2, at ¶ 4]. Nothing about this statement references a gender stereotype, let alone establishes Mr. Mikula's non-conformity with such a stereotype.

Finally, there is no evidence in the record that suggests Mr. Mikula's request for a more diverse hiring pool and efforts to hire women are in any way outside the norm of male behavior at West Shore. Again, Mr. Mikula's actions in this regard are wholly consistent with West Shore's policies. For example, West Shore's Equal Employment Opportunity policy clearly prohibits discrimination in hiring based on gender. [ECF 39-8]. Consistent with that policy, Mr. Mikula testified that when he asked for a more diverse hiring pool, Mr. Wood promptly gave it to him. [ECF 39-1, at 124:1-6]. There is evidence in the record that West Shore enforces its

equal employment opportunity policy. During his deposition, Mr. Mikula testified that there are female employees of West Shore serving in management positions and some who directly report to West Shore's owner and CEO. [*Id.* at 109:15-110:1, 116:9-11, 116:15-24]. In fact, Mr. Mikula was even replaced by a woman when he left his first position as a Field Sales Manager. [*Id.* at 115:15-22].

As for the general corporate culture at West Shore, Mr. Mikula testified that he never heard Mr. Wood, Mr. Leary, or Mr. Wezyrn make any discriminatory comments about women during his tenure. [ECF 39-1, at 104:7-24]. And other than the inappropriate "Mike Hunt" joke, Mr. Mikula never heard Mr. Parker make any harassing or discriminatory comments. [*Id.* at 104:25-105:6].

In the end, Mr. Mikula "has presented nothing but his own speculation and conclusory allegations that [West Shore] discriminated against him for failure to comply with a gender stereotype. Such unsupported allegations are insufficient to survive a motion for summary judgment." *Kiser*, 2012 WL 1134810, at *4 (granting summary judgment where plaintiff argued that "the 'gender stereotype that women should be primarily responsible for child care' resulted in him being assigned to work overtime against his will, and ultimately, dismissed from the USPS."); *see also Kahan v. Slippery Rock Univ. of Pa.*, 50 F. Supp. 3d 687, 691 (W.D. Pa. 2014) (granting summary where "[n]o reasonable jury could infer that SRU treated females more favorably than males based upon the evidence of purported gender stereotypes produced by Kahan, making it impossible for Kahan to satisfy his burden to establish a *prima facie* case of gender discrimination on this basis.").

Therefore, the Court will **GRANT** West Shore's Motion with respect to Mr. Mikula's Title VII discrimination claims in Counts II and V of the Amended Complaint.

### C. Mr. Mikula's Emotional Distress Claims Fail.[4]

In Count III of the Amended Complaint, Mr. Mikula asserts intentional and negligent infliction of emotional distress claims based on the allegation that West Shore "intentionally discharged [him] to punish and harm him to send a strong message to him and others in the workplace to not oppose [West Shore's] intentional desire to engage in offensive behavior, including but not limited to treating women as second class citizens." [ECF 43, at 17]. These emotional distress claims fail, however, for three, independent reasons.[5]

---

[4] In a footnote, Mr. Mikula argues that the Court should disregard West Shore's arguments about the emotional distress claims based on an alleged failure to comply with the "meet and confer" requirement in Chief Judge Hornak's Standing Order and Procedures on Civil Motion (Chief Judge Hornak was previously assigned to this case). [ECF 43, at 18]. This Court does not have a meet and confer requirement for Rule 56 motions. Even if it did, the Court finds that West Shore sufficiently discussed the pending Motion with Mr. Mikula before filing.

[5] "The Pennsylvania Supreme Court has yet to formally recognize a cause of action for intentional infliction of emotional distress, but it has indicated that if it were to recognize such a cause of action, a plaintiff would, at minimum, need to establish that (1) the defendant's conduct was intentional or reckless, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's conduct caused

### 1. The Claims Are Barred by the Pennsylvania Workers' Compensation Act.

Mr. Mikula's negligent and intentional infliction of emotional distress claims are barred by the exclusivity provision of the Pennsylvania Workers' Compensation Act (the "PWCA").

Generally, the PWCA bars claims for "intentional and/or negligent infliction of emotional distress [arising] out of [an] employment relationship." *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 940 (3d Cir. 1997); *see also Kumar v. UPMC Physician Servs.*, No. 04-1239, 2006 WL 1805691, at *13 (W.D. Pa. June 28, 2006) ("The court finds that plaintiff's claims for intentional infliction of emotional distress and negligent infliction of emotional distress arise out of her employment relationship with defendant and, thus, are barred by the exclusivity provision of the Pennsylvania Workers' Compensation Act."). Mr. Mikula acknowledges the existence of this exclusivity principle but argues that it does not apply "where the claim is based on sexual harassment and…retaliation." [ECF 43, at 17]. Mr. Mikula dramatically overstates the breadth of this exception.

The only limited exception to PWCA coverage is "known as the 'personal animus' or 'third party attack' exception." *Hancuff v. Prism Techs. & Assemblies*, 357 F. Supp. 2d 828, 831 (W.D. Pa. 2005). To take advantage of this exception, "an employee must assert that his injuries are not work-related because he was injured by a co-worker for purely personal reasons." *Id.* at 832 (quoting *Hammerstein v. Lindsay*, 655 A.2d 597, 601 (Pa. Super. Ct. 1995)). "Where the animosity between the third party and the injured employee is developed because of work-related disputes, the animosity is developed because of the employment, and the injured employee's remedy is exclusively under the [PWCA]." *Id.* "Moreover, if the third party would have attacked a different person in the same position as the injured employee, that attack falls outside the exception and is covered exclusively by the [PWCA]." *Id.* Thus, an "ordinary" sexual harassment claim "occurring in the workplace would be preempted by the PWCA." *Id.* at 834 (dismissing intentional infliction of emotional distress claim where harassing employee's conduct appeared "to be motivated by sexual bias, not a personal animosity").

Categorically, "[c]laims against employers for negligent infliction of emotional distress do not fall within the personal animus exception." *Hettler v. Zany Brainy, Inc.*, No. 99-3879, 2000 WL 1468550, at *6 (E.D. Pa. Sept. 27, 2000). Intentional infliction of emotional distress claims "are excepted only where they are wholly, or nearly wholly, based on distinctly personal issues, often pre-dating the employment, and thus disconnected from the work situation." *Lamb v. Outback Steakhouse of Florida, Inc.*, No. 8:13-cv-794, 2014 WL 12689882, at *13 (M.D. Fla. Sept. 4, 2014) (applying Pennsylvania law); *see also Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 160 n. 16 (3d Cir. 1999) (querying "whether an [intentional infliction of emotional distress] claim for harassment more disconnected from the work situation would be preempted, for example where a supervisor sexually assaulted an employee or stalked her outside of work.").

---

emotional distress, and (4) the resultant emotional distress was severe." *Buttermore v. Loans*, No. 15-1514, 2016 WL 308875, at *6 (W.D. Pa. Jan. 25, 2016) (collecting cases). Because Mr. Mikula's claim is barred and he cannot satisfy these elements even if it were not barred, the Court need not opine on whether the Pennsylvania Supreme Court would officially recognize an intentional infliction of emotional distress claim.

The sex discrimination in this case is not alleged to have been motivated by some personal animus directed at Mr. Mikula, personally. Instead, it was related to alleged bias against **all** men at West Shore who do not conform to a supposed stereotype that men do not "support and provide equal employment treatment to women." [ECF 43, at 10]. Thus, it is alleged to have arisen in the context of Mr. Mikula's employment. Mr. Mikula's effort to shoehorn his emotional distress claims into the personal animus exception is unsupported by the record and fails as a matter of law. *See Hancuff*, 357 F. Supp. 2d at 831.

### 2. The Conduct Alleged Is Not Sufficiently Extreme to State a Claim for Intentional Infliction of Emotional Distress.

Mr. Mikula argues that an "employment discharge" to "send a strong message" not to oppose West Shore's "intentional desire to engage in offensive behavior" could "be regarded as outrageous by a jury" and support a finding of intentional infliction of emotional distress. [ECF 43, at 17]. Not so.

For a plaintiff to recover on an intentional infliction of emotional distress claim, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Imboden v. Chowns Comm'cns*, 182 F. Supp. 2d 453, 456 (E.D. Pa. 2002) (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 2002)).

"[I]t is extremely rare to find conduct in the employment context that will give rise to the level of outrageousness necessary to provide a basis for recovery of the tort of intentional infliction of emotional distress." *Cox*, 861 F.2d at 395. Indeed, this burden is so high that one court held that "[p]ush[ing] a utility knife into [female employee's] breast" was ***not*** sufficient "to support a claim for intentional infliction of emotional distress." *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 439 (E.D. Pa. 2010). The only instance in which Pennsylvania courts have found retaliatory termination sufficient to support a claim for intentional infliction of emotional distress, is where an employer engaged in both sexual harassment and retaliated against the employee "for turning down sexual propositions." *Connearney v. Main Line Hosps., Inc.*, No 15-2730, 2015 WL 9302912, at *8 (E.D. Pa. Dec. 22, 2015) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1487 (3d Cir. 1990)). "[O]ffensive comments and gestures in the workplace, even though sexually explicit, are not enough to satisfy the *Andrews* extra requirement of sexual propositions." *Wasserman v. Potamkin Toyota, Inc.*, No. 98-0792, 1998 WL 744090, at *3 (E.D. Pa. Oct. 23, 1998).

The circumstances of Mr. Mikula's termination do not approach the level of outrageousness needed to support a claim of intentional infliction of emotional distress in the employment context. Mr. Mikula does not allege that anyone made sexual advances toward him. As for what he does allege, courts have repeatedly dismissed intentional infliction of emotional distress claims when, as here, the plaintiff claimed that he or she was terminated in retaliation for reporting incidents of harassment:

- *Imboden*, 182 F. Supp. 2d at 457-58 ("Plaintiff has not alleged retaliation based on rejection of sexual advances or propositions. Indeed, she does not allege that any such sexual advances or propositions were made to her. The only retaliation

- 13 -

alleged in the Complaint is 'retaliation for complaining about sex discrimination.' This, however, is not the type of retaliation required to maintain a claim for intentional infliction of emotional harm.");

- *Connearney*, 2015 WL 9302912, at *8 (granting motion to dismiss where plaintiff contended that "Defendants terminated her on pretextual charges in retaliation for her reports of bullying, harassment, a hostile work environment, and age discrimination."); and

- *Remp v. Alcon Labs., Inc.*, No. 13-6407, 2016 WL 1161616, at *9 (E.D. Pa. Mar. 24, 2016) (granting motion for summary judgment where plaintiff "has not demonstrated that McQueen's threat of a lawsuit and other statements made during her August 17th meeting are sufficiently extreme and outrageous to support an IIED claim").

Accordingly, Mr. Mikula's intentional infliction of emotional distress claim fails as a matter of law for this reason as well.

### 3. Mr. Mikula Has Not Demonstrated Any Physical Manifestation of Distress.

West Shore's final argument in support of summary judgment on the emotional distress claims is that Mr. Mikula has failed to "demonstrate some physical manifestation of distress to support a claim of intentional infliction of emotional distress." [ECF 37, at 20]. Mr. Mikula offered no response to this argument in his opposition brief and, therefore, has conceded the issue. *See, e.g.*, *Brown v. Johnson*, 116 F. App'x 342, 346 (3d Cir. 2004) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial court of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal."); *Hackett v. Cmty. Behavioral Health*, No. 03-6254, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005) ("Thus, the response does not defend the viability of Hackett's claims based upon race and gender discrimination under Title VII and the PHRA, or the claim of a violation of her rights under the FMLA. As a result, it appears that Hackett has also abandoned these claims."), *aff'd*, 171 F. App'x 968 (3d Cir. 2006).

Even if Mr. Mikula had not conceded the issue, summary judgment would still be appropriate. West Shore is correct that Mr. Mikula must demonstrate physical injury or harm to sustain a cause of action for his emotional distress. *See Buttermore*, 2016 WL 308875, at * 7 ("To the extent state and federal courts in Pennsylvania recognize a claim for intentional infliction of emotional distress, they consistently require that a plaintiff suffer some physical manifestation of his alleged emotional distress."); *Matczak*, 136 F.3d at 940 (rejecting a plaintiff's negligent infliction of emotional distress claim where the only physical manifestation of plaintiff's emotional distress was that he cried at least once a week after being fired). Mr. Mikula identified no physical manifestations of alleged emotional distress in discovery or in his pleadings. And Mr. Mikula confirmed during his deposition that he never sought medical treatment for any of the alleged distress he suffered because of West Shore's actions. [ECF 39-1, at 146:24-137:2, 147:17-19].

Mr. Mikula's complete failure in this regard provides an independent basis for dismissing his emotional claims in Count III of the Amended Complaint. *See, e.g.*, *Remp*, 2016 WL 1161616, at *9 ("Moreover, Remp has failed to present any evidence that she suffered any physical harm or physical manifestation of her emotional distress as the result of McQueen's threats. Accordingly, I find that there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law on Remp's IIED claim."); *Ghrist v. CBS Broad., Inc.*, 40 F. Supp. 3d 623, 631 (W.D. Pa. 2014) (dismissing plaintiff's IIED claim where plaintiff "failed to allege the necessary physical harm, coupled with averments of competent medical evidence of such harm, to support such a claim."); *O'Hara v. Hanley*, No. 08-1393, 2011 WL 900033, at *10 (W.D. Pa. Mar. 14, 2011) ("In this case, Plaintiff has offered no evidence of any type of physical harm resulting from the defendants' purportedly outrageous conduct. For this reason, Plaintiff's claim for intentional infliction of emotional distress fails. Summary judgment is entered in favor of [defendant].").

Accordingly, the Court will **GRANT** West Shore's Motion with respect to Count III of the Amended Complaint.

## V.  CONCLUSION

For all the reasons discussed above, Defendants' Motion for Summary Judgment [ECF 36] will be **DENIED IN PART** and **GRANTED IN PART**. The Motion is **DENIED** with respect to Counts I and IV, and the Motion is **GRANTED** with respect to Counts II, III, and V of the Amended Complaint. An appropriate Order follows.

DATED this 29th day of October, 2019.

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge